# 11-3591-cr(L)

## 11-3778-cr(CON), 11-4193-cr(CON), 11-4409-cr(CON)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

————— ▸▸ ◂◂ —————

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JASON GOLDFARB, CRAIG DRIMAL, ZVI GOFFER, MICHAEL KIMELMAN,

*Defendants-Appellants,*

ARTHUR CUTILLO, EMANUEL GOFFER, DAVID PLATE,

*Defendants.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLANT ZVI GOFFER

Alexander Martin Dudelson
LAW OFFICE OF
  ALEXANDER M. DUDELSON
*Attorneys for Defendant-Appellant
  Zvi Goffer*
26 Court Street, Suite 2306
Brooklyn, New York 11242
718-855-5100

# **TABLE OF CONTENTS**

Table of Authorities............................................................................iii

Jurisdictional Statement.....................................................................1

Introduction.......................................................................................1

Issues Presented................................................................................2

Statement of the Case........................................................................3

Statement of Facts.............................................................................4

Summary of the Argument................................................................25

Argument

I.    APPELLANT IS ENTITLED TO A NEW TRIAL
      BECAUSE THE DISTRICT COURT GAVE THE
      JURY AN ERRONEOUS DEFINITION OF MATERIAL,
      NONPUBLIC INFORMATION................................................................26

      A.    The Court's Definition of Material,
            Non-public Information was Erroneous.............................................28

      B.    The Record Shows that the 3Com Trades
            Were Clearly Based on Information that
            was Available to the Public.............................................................30

II.   THE DISTRICT COURT VIOLATED THE APPELLANT'S
      CONSTITUTIONAL RIGHT BY PUNISHING THE DEFENDANT
      FOR EXERCISING HIS RIGHT TO GO TO TRIAL RATHER
      THAN ENTERING A PLEA OF GUILTY................................................33

III.  APPELLANT'S COUNSEL WAS INEFFECTIVE IN

FAILING TO OBJECT TO THE GOVERNMENT'S
CONTENTION THAT APPELLANT SHOULD RECEIVE A
FOUR POINT INCREASE UNDER U.S.S.G. § 3B1.1..............................38

    A.    At sentencing Appellant's counsel simply
           conceded that the Appellant was the Leader/
           Organizer of the conspiracy...............................................42

    B.    The Appellant's conduct did not warrant
           a four-level increase under § 3B1.1....................................44

IV.    THE SENTENCE IMPOSED, WHEN VIEWED IN THE
       TOTALITY OF THE CIRCUMSTANCES, IS DISPROPORTIONATE
       TO SIMILARLY SITUATED DEFENDANTS..........................................47

V.    THE DISTRICT COURT ERRED IN ORDERING THE
      APPELLANT TO FORFEIT $10,022,931.00.............................................52

Conclusion...................................................................................................51

# TABLE OF AUTHORITIES

## CASES

Basic, Inc. v. Levinson,
    485 U.S. 224, 108 S.Ct. 978, 99 L.E.2d 194 (1988)................................29

Bordenkircher v. Hayes,
    434 U.S. 357, 98 S.Ct. 663, 54 L.E.2d 604 (1978)................................33

Elkind v. Liggett & Meyers, Inc.,
    635 F.2d 156 (2d Cir.1980)................................29

Flores v. Demskie,
    215 F.3d 293 (2d Cir. 2000)................................42

Harmelin v. Michigan,
    501 U.S. 957 (1991)................................47

Hess v. United States,
    496 F.2d 936 (8th Cir. 1974)................................34

Kimmelman v. Morrison,
    477 U.S. 365 (1986)................................43

Murray v. Carrier,
    477 U.S. 478 (1986)................................46

Strickland v. Washington,
    466 U.S.668 (1984)................................42

TSC Industries, Inc. v. Northway, Inc.,
    426 U.S. 438, 96 S.Ct. 2126, 48 L.E.2d 757 (1976)................................30

SEC v. Anton,
  No. 06-2274, 2009 WL 1109324(E.D.Pa April 23, 2009)....................................29

SEC v. Ballesteros Franco,
  253 F.Supp.2d 720 (S.D.N.Y. 2003)..................................................................46

SEC v. Monarch Fund,
  608 F.2d 938 (2d Cir. 1979)...........................................................................29

SEC. v. Rorech,
  720 F.Supp.2d 367 (S.D.N.Y.)....................................................................29, 32

United States v. Avila,
  95 F.3d 887 (9th Cir. 1996).............................................................................42

United States v. Booker,
  542 U.S. 220 (2005).......................................................................................45

United States v. Beaulieau,
  959 F.2d 375 (2d Cir. 1992)...........................................................................41

United States v. Brinkworth,
  68 F.3d 633 (2d Cir. 1995)..............................................................................40

United States v. Briing,
  557 F.3d 707 (6th Cir. 2009)...........................................................................52

United States v. Cambrelen,
  2001 WL 219285 (2d Cir. NY).........................................................................40

United States v. Casey,
  444 F.3d 1071 (9th Cir. 2006)........................................................................52

United States v. Cherry,
  366 F.Supp.2d 372 (E.D.Va 2005)..................................................................51

United States v. Contorinis,

09 CR 1083 (S.D.N.Y.)............................................................50

United States v. Crocker,
  788 F.2d 802 (1st Cir. 1986)............................................34

United States v. Crosby,
  397 F.3d 103 (2d Cir. 2005)............................................48

United States v. Cusimano,
  123 F.3d 83, 88 (2d Cir. 1997)........................................29

United States v. Dietz,
  950 F.2d 50 (1st Cir. 1991)............................................39

United States v. Fatico,
  603 F.2d 1053 (2d Cir. 1979)..........................................47

United States v. Frias,
  521 F.3d 229(2d Cir. 2008)............................................47

United States v. Frost,
  914 F.2d 756 (6th Cir. 1990)...........................................34

United States v. Gordon,
  2006 WL 1675921 (S.D.N.Y. 2006)...............................51

United States v. Gray,
  362 F.Supp.2d 714 (S.D.W.Va. 2005)............................51

United States v. Greenfield,
  44 F.3d 1141 (2d Cir. 1995)............................................39

United States v. Greer,
  223 F.3d 41 (2d Cir. 2000)..............................................39

United States v. Holliday,
  457 F.3d 121 (1st Cir. 2006)............................................38

United States v. Hoover-Hankerson,
   511 F.3d 164 (D.C.Cir 2007)....................................................52

United States v. Hutchings,
   757 F.2d 11 (2d Cir. 1985)......................................................34

United States v. Kalish,
   2009 WL 130215 (S.D.N.Y. 2009)..........................................53

United States v. Leonard,
   37 F.3d 32 (2d Cir. 1994)........................................................39

United States v. Lozano-Hernandez,
   89 F.3d 785 (11th Cir. 1996)...................................................40

United States v. McKeithen,
   822 F.2d 310 (2d Cir. 1987).....................................................53

United States v. Melendez,
   41 F.3d 797 (2d Cir. 1994)......................................................41

United States v. Monroe,
   943 F.2d 1007 (9th Cir. 1991)..................................................34

United States v. Nacchio,
   05-CR-545 (D.Col)..................................................................49

United States v. Nassem,
   07 CR 610 (S.D.N.Y.)..............................................................50

United States v. Rajaratnam,
   2011 WL 3585075 (S.D.N.Y. 2011).........................................46

United States v. Rajaratnam,
   09 CR 1194 (S.D.N.Y.)............................................................49

United States v. Rodriguez,
  959 F.2d 193 (11 Cir. 1992).................................................................36

United States v. Roe,
  670 F.2d 956 (11th Cir. 1982)...........................................................35

United States v. Santos,
  553 U.S. 507 (2008)...........................................................................53

United States v. Sitton,
  968 F.2d 947 (9th Cir. 1992)............................................................36

United States v. Stevens,
  985 F.2d 1175 (2d Cir. 1993).............................................................40

United States v. Tejada-Bletran,
  50 F.3d 105 (1st Cir. 1995)..............................................................39

United States v. Thiongo,
  344 F.3d 55 (1st Cir. 2003)..............................................................39

United States v. Torres,
  129 F.3d 710 (2d Cir. 1997)...............................................................42

United States v. Venturella,
  585 F.3d 1013 (7th Cir. 2009)..........................................................52

United States v. Wills,
  476 F.3d 103 (2d Cir. 2007)...............................................................47

United States v. Wright,
  533 F.2d 214 (5th Cir. 1976)............................................................34

## STATUTES

15 U.S.C. § 78j(b)...................................................................................7

15 U.S.C. § 78ff...................................................................................7

17 CFR § 240.10b-5..........................................................................4, 5

18 U.S.C. § 981(a)(1)(C)...................................................................52

18 U.S.C. § 3231...............................................................................1

18 U.S.C. § 3553(a)..........................................................................48, 49

## RULES

Fed.R.Crim.P 32.2............................................................................48

## MISCELLANEOUS

U.S.S.G. § 2B1.1(b)(1)(J)..................................................................32

U.S.S.G. § 2B1.1(b)(1)(K)..................................................................25, 32, 43

U.S.S.G. § 2B1.1(b)(1)(J)..................................................................49

U.S.S.G. § 2B1.4................................................................................24

U.S.S.G. § 2B1.4(a)...........................................................................49

U.S.S.G. § 3B1.1................................................................................38, 41, 44

U.S.S.G. § 3C1.1................................................................................36

U.S.S.G. § 3E1.1................................................................................35

Zvi Goffer ("Appellant") appeals from a judgment of conviction ("Judgment") (SPA-4)[1] and order of forfeiture (the "Forfeiture Order") entered on September 22, 2011 in the United States District Court for the Southern District of New York. (SPA-1). Judgment and Forfeiture Order were entered after Goffer was convicted by a jury at trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. On September 22, 2011, the district court entered the Judgment and Forfeiture Order. (A-1024)[2]. Goffer timely filed a notice of appeal on September 30, 2011. (A-1033). This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

Appellant's conviction should be reversed, and, if the Court reaches the Forfeiture Order, it should be vacated.

Appellant was convicted of insider trading based on a jury instruction that wrongly defined what constitutes material, non-public information for purposes of

---

[1] Refers to the Special Appendix.

[2] Refers to the Joint Appendix

-1-

the securities laws. Specifically, the district court erred in instructing the jury on when and how the confirmation of already public information can itself constitute material, non-public information.

In addition, at the very least, the sentence in this proceeding should be vacated and remanded to the sentencing court for clarification. In its justification for withholding a two-level decrease under the Sentencing Guidelines for an acceptance of responsibility, it is clear that the district court was not withholding a reward it would have given to a guilty pleader, but was rather extending punishment to one who pleaded not guilty. The court also failed to consider that the Appellant was not the leader or organizer of the conspiracy, which resulted in a four-level increase under the Sentencing Guidelines. Finally, it is evident that the Appellant was unduly punished when looking at the sentence of similarly situated defendants.

## ISSUES PRESENTED

1.     Whether the Appellant is entitled to a new trial because the district court misinstructed the jury as to what constitutes material, nonpublic information, and permitted the jury to convict if it found that the tipper simply confirmed public information that was already known by the investigating public.

2.     Whether the Appellant's Constitutional rights were violated when the

District Court punished the Appellant for exercising his right to go to trial rather than entering a plea of guilty.

  3.  Whether Appellant's counsel was ineffective in failing to object to the government's contention that Appellant should have received a four level enhancement pursuant to U.S.S.G. § 3B1.1.

  4.  Whether the Appellant should be re-sentenced because the district court, in view of the totality of the circumstances, failed to consider sentencing disparities.

  5.  Whether the district court erred in ordering the forfeiture of $10,022,931.00 from the Appellant, where the majority of the profits were never realized by the Appellant in any way.

## STATEMENT OF THE CASE

  Appellant was indicted on January 21, 2010.  A superceding indictment was filed on April 7, 2011.  (A-15).  Count One and Two charged Goffer with conspiracy to commit securities fraud.  (A-15).  Counts Three through Fourteen alleged substantive violations of the securities laws.  (A-19).  Each of the substantive counts were based on trades in stock of 3Com and Axcan.  (A-19).

  A jury was impaneled on May 18, 2011.  (A-875).  On June 13, 2011, the jury returned a guilty verdict against the Appellant on Counts One through

Fourteen.  (A-876).

On September 21, 2011, the district court sentenced Goffer to 120 months' imprisonment (A-1015).  On September 22, 2011, the district court entered the Judgment (A-1027) and the Forfeiture Order that required Appellant to forfeit $10,022,931.00 (A-1024).

On September 30, 2011, Goffer timely filed a notice of appeal. (A-1033).

## STATEMENT OF FACTS

### Superceding Indictment:

A Superceding Indictment was filed on April 7, 2011.  (A-15). The Indictment contained fourteen counts.  Counts One and Two charged Appellant with conspiracy to commit securities fraud. (A-15).  Count Three  alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on August 7, 2007 the co-conspirators, Appellant and Jason Goldfarb, caused 75,000 shares of 3Com stock to be purchased on the basis of material non-public knowledge in Appellant's Schottenfeld account.  (A-33).  Count Four alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 in that on August 7, 2007 the co-conspirators, Appellant and Craig Drimal, caused 525,000 shares of 3Com stock to be purchased on the basis of material non-public knowledge in Drimal's account. (A-33).  Count Five alleged securities fraud, in violation of Title 17 CFR §

-4-

240.10b-5 alleging that on August 7, 2007 the co-conspirators, Appellant and

Emanuel Goffer, caused 30,000 shares of 3Com stock to be purchased on the basis

of material, non-public knowledge in a Spectrum Trading Account. (A-33).

Count Six alleged securities fraud, in violation of Title 17 CFR § 240.10b-5

alleging that on August 10, 2007 the co-conspirators, Appellant and Michael

Kimelman, caused 15,000 shares of 3Com stock to be purchased on the basis of

material, non-public knowledge in Kimelman's account. (A-33). Count Seven

alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on

September 17, 2007 the co-conspirators, Appellant and Craig Drimal, caused

30,000 shares of 3Com stock to be purchased on the basis of material, non-public

knowledge in Drimal's account. (A-33). Count Eight alleged securities fraud in

violation of Title 17 CFR § 240.10b-5 alleging that on September 17, 2007 the co-

conspirators, Appellant and Jason Goldfarb, caused 30,000 shares of 3Com stock

to be purchased on the basis of material nonpublic knowledge in Appellant's

Schottenfeld account. (A-34). Count Nine alleged securities fraud, in violation of

Title 17 CFR § 240.10b-5 alleging that on September 21, 2007 the co-

conspirators, Appellant and Emanuel Goffer, caused 93,900 shares of 3Com stock

to be purchased on the basis of material, non-public knowledge in Emanuel

Goffer's Spectrum Trading Account. (A-34). Count Ten alleged securities fraud,

in violation of Title 17 CFR § 240.10b-5 alleging that on September 17, 2007 the co-conspirators, Appellant and Craig Drimal, caused 100,000 shares of 3Com stock to be purchased on the basis of material, non-public knowledge in Drimal's account.  (A-34).  Count Eleven alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on September 25, 2007 the co-conspirators, Appellant and Jason Goldfarb, caused 20,000 shares of 3Com stock to be purchased on the basis of material, non-public knowledge in Appellant's Schottenfeld account.  (A-34).  Count Twelve alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on September 25, 2007 the co-conspirators, Appellant and Michael Kimelman, caused 5,000 shares of 3Com stock to be purchased on the basis of material nonpublic knowledge in Kimelman's account.  (A-34).  Count Thirteen alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on November 20, 2007 the co-conspirators, Appellant and Craig Drimal, caused 20,000 shares of 3Com stock to be purchased on the basis of material, non-public knowledge in Drimal's account. (A-34).  Count Fourteen alleged securities fraud, in violation of Title 17 CFR § 240.10b-5 alleging that on November 26, 2007 the co-conspirators, Appellant and Craig Drimal, caused 30,000 shares of 3Com stock to be purchased on the basis of material, non-public knowledge in Drimal's account.  (A-34).

The superceding indictment alleged that in the course of their work at Ropes & Gray, Arthur Cutillo and Brien Santarlas had access and learned material, non-public information concerning the acquisition of 3Com by Bain Capital as well as the acquisition of Axcan by TPG Capital. (A-18). The information was then provided to the Appellant and Jason Goldfarb (who paid for the information). (A-19). The information was then provided to Craig Drimal, Emanuel Goffer, Michael Kimmelman and David Plate, by the Appellant, who then bought equity in the companies as a result of the information (A-22) in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2.

## The Trial

The Appellant did not testify on his own behalf at trial. The government offered the testimony of Barbara Marie Gueth, Special Agent Jan Trigg, Alfred Rose and Special Agent Matthew Thoresen. The government also offered the testimony of Brien Santarlas, David Slaine and David Plate, individuals cooperating with the government whom were previously convicted for insider trading.

## Testimony of Alfred Rose:

Alfred Rose ("Rose") is a partner in the law firm Ropes & Gray. (A-141). He is the head of the firm's private equity group. (A-141). As head of the private

equity group, Rose manages the group within the firm that represents clients who are in the business of buying companies, operating them for a period of time, trying to improve them, and then sell the companies. (A-141, 142). Private equity firms are in the business of purchasing public or private companies. (A-143). The law firm of Ropes & Gray's role in a private equity transaction is to perform due diligence. (A-143). Due diligence consists of reviewing legal documents regarding the company, assessing whether or not there are issues with the company, and determining a fair purchase price. (A-143). When a company is being approached by a private equity firm, a confidentiality agreement is negotiated to ensure that the company's secrets will only be used to evaluate the transaction, and so that the recipients of the information keep the same non-public. (A-145).

When Ropes & Gray is working on a transaction, the documents are maintained in a document management system that is accessible to employees. (A-148). Once the transaction is agreed upon, an announcement is made to the public. (A-148). The transaction is completed in a "closing room," which is a room located in the law firm where the documents for the closing are laid out and signed. (A-338).

Ropes & Gray has a confidentiality policy that is signed by its employees.

(A-151). The policy recites the professional codes of conduct for lawyers in the jurisdictions where the firm operates, and states that the attorneys should not discuss the affairs of the clients with outsiders. (A-151). Employees are also prohibited from disclosing any information about any company that has not been made public to anyone who would or can use the information to trade in the securities market or pass it along to someone who would trade in the securities markets. (A-152). The fact that an acquisition is under consideration is itself confidential information. (A-342). This information is confidential due to the fact that an acquisition will likely cause the stock price to elevate. (A-154). If a private equity firm wants to purchase a company, the firm must give the majority of its shareholders an incentive to vote in favor of the sale. (A-154). Therefore, the private equity firm and the majority of shareholders must agree on a purchase price that is greater than the current trading price of a stock. (A-154).

A.    3COM

In September of 2007, there was an announcement of the purchase of a publically traded company known as 3Com. (A-160). For this transaction, Ropes & Gray's private equity client, Bain Capital, formed a company with Huawei that agreed to buy 3Com from its public shareholders. (A-160). In June of 2007, Bain Capital and 3Com negotiated a confidentiality agreement. (A-161). In connection

-9-

with the purchase of 3Com, Ropes & Gray reviewed and proposed changes to acquisition agreements, negotiated side agreements and the equity commitment agreement. (A-163). All of the documents were stored in a document management system that was accessible to Ropes and Gray employees. (A-163). 3Com reached an agreement with Bain Capital to be bought for $2.2 billion. (A-181). On September 28, 2007, It was publically announced that Bain Capital was going purchase 3Com. (A-187).

On July 17, 2007, an article was published in the Wall Street Journal regarding the 3Com acquisition. (A-187). Mr. Rose testified that the Wall Street Journal is a respected news reporting organization. (A-182). The article stated that:

> The consolidation wave that is sweeping the telecom equipment sector may wash over 3Com. The Deal Journal has learned that the company has in the past couple of months been approached by possible buyers, including private equity firms like Silver Lake Partners and Bain Capital. 3Com and its bankers at Goldman Sachs Group don't appear to be rushing to do a deal and it is unclear what price the buyout group was willing to offer. Another company that may be interested in 3Com is Nortel Networks, people familiar with the matter said. (A-183, 184).

*   *   *

> Whether or not a buyout of 3Com is on the horizon, the Marlborough, Massachusetts company is definitely in deal-making mode. (A-185).

*    *    *

> A buyout of 3Com at the right price would likely be music to the ears
> of investors including Citadel Investment Group, which has taken a
> stake in nearly 10 percent in 3Com and has agitated for change. (A-
> 185).

Rose testified that all of the information in the Wall Street Journal was factually

correct. (A-187).

On September 15, 2007, a definitive offer was made to purchase 3Com for

$5.10 per share. (A-208). The offer was made by the filing of a SEC 14A Form,

which is a public SEC filing. (A-208).

On September 26, 2007, Bain Capital hired a communications firm to

handle public relations involved with the pending 3Com announcement. (A-187).

Rose testified that he was aware that the Wall Street Journal contacted the

communications firm on September 27, 2007, before the deal was announced. (A-

187). On September 28, 2007, the parties contracted to purchase 3Com at $5.30

per share. (A-209).

B.    AXCAN

Ropes & Gray also represented TPG Capital, a private equity firm for the

acquisition of Axcan. (A-165). Ropes & Gray began to work on the transaction in

the fall of 2007. (A-166). The transaction was publically announced on

-11-

November 29, 2007 at 5:40 a.m. GMT.  (A-183-185).

C.     <u>CLEAR CHANNEL</u>:

Rose worked on a deal with Clear Channel through his employment with Ropes & Gray.  (A-168).  In March of 2008, there was a dispute between the lenders and the private equity firms over the terms of the financing and the deal eventually broke down.  (A-168).  A closing room had been prepared in connection with the Clear Channel deal in Ropes & Gray's office in New York City.  (A-168).  In late March of 2008, the private equity firms did sue the lenders in the New York and Texas courts.  (A-169).  On March 25, 2008, newspapers were reported that the Clear Channel deal was collapsing.  (A-207).  On March 26, 2008, there was a public announcement which stated that "Clear Channel Communications Inc. joined by CC Media Holdings, Inc. a unit of Thomas H. Lee Partners LP and Bain Capital Partners LC, today sued the banks who has committed to financing the debt connected to their $26 billion merger for tortious interference."  (A-177).  In May of 2008, the two lawsuits were scheduled for trial, which precipitated in negotiations.  (A-179).  The deal was then restructured.  (A-179).  Ropes & Gray worked on the document management relating to the restructuring process of the deal.  (A-179).  On May 13, 2008, a public announcement was issued, which stated that "Clear Channel Communications

-12-

announces settlement of litigation and amended merger agreement with private

equity group co-sponsored by Thomas H. Lee Partners LP and Bain Capital

Partners LLC." (A-179).

Testimony of Brien Santarlas:

Brien Santarlas ("Santarlas") is thirty-four years of age (A-224) and was

laid off by Ropes & Gray in the fall of 2008. (A-226). At Ropes & Gray,

Santarlas was employed as an attorney and worked on corporate acquisition. On

November 4, 2009, the Federal Bureau of Investigation ("FBI") approached

Santarlas and asked him about insider trading activities involving Arthur Cutillo,

Jason Goldfarb, himself and others. (A-227). Santarlas testified that he did not

tell the FBI the complete truth during that meeting. (A-227). Eventually,

Santarlas signed an agreement with the government in hopes of receiving a

reduced sentence. (A-229). Ultimately, he entered a plea of guilty to securities

fraud and conspiracy to commit securities fraud. (A-230).

Santarlas testified that he violated his obligations to Ropes & Gray and its

clients when he shared confidential information with Arthur Cutillo ("Cutillo")

and Jason Goldfarb ("Goldfarb"). (A-232). Cutillo was a colleague of Santarlas'

at Ropes & Gray. Santarlas met Goldfarb through Cutillo. (A-233). In the

summer of 2007, Cutillo advised Santarlas that Goldfarb had a friend that traded

-13-

stock, who would pay money for tips for any information.  (A-233, 234).

Approximately two weeks later Santarlas met with Goldfarb.  (A-234).  Goldfarb

advised Santarlas that he had a childhood friend that would pay for information

regarding corporate buyouts or acquisitions.  (A-234).  Santarlas testified that he

does not know Zvi Goffer, Emanuel Goffer or Michael Kimelman  (A-295), nor

has he ever met Zvi Goffer (A-316).

A.    3COM

In the summer of 2007, Santarlas learned that several colleagues at Ropes

and Gray were staffed to work on a takeover of 3Com.  (A-236).  He also

confirmed his findings by looking at documents that were printed in community

printers in the office, and with Cutillo.  (A-237).  Santarlas would also search the

law firm computer system for information related to 3Com.  (A-237).  He would

not actually preview a document so that there would be no indication in the

computer system that he accessed a document.  (A-238).  Santarlas would simply

look at the titles of documents such as "merger agreements, bid documents, and

closing agendas.  (A-239).

As the 3Com deal progressed, Santarlas and Cutillo would meet with

Goldfarb and provide him with updates regarding the deal.  (A-240).  At some

point Cutillo provided Santarlas with a prepaid mobile telephone.  (A-240).

-14-

Cutillo informed Santarlas that the pre-paid phone came from Goldfarb. (A-241).
Santarlas was also informed by Cutillo that Goldfarb also had a pre-paid phone to
directly contact the stock trader. (A-242). In September of 2007, Santarlas
advised Goldfarb that he was seeing a lot more activity in the 3Com takeover. (A-
243). Initially, Santarlas did not have any information regarding a purchase price
for 3Com or a closing date. (A-328, 329). Santarlas could not recall if he advised
the FBI that he had never had access to pricing information or 3Com documents
(A-331, 332), but recalled that he saw a bid sheet for approximately $4.00 per
share. (A-572). Santarlas could also not recall the contents of the final merger
agreement that he reported to Goldfarb. (A-334). Santarlas did not report to work
at Ropes & Gray the last week of September of 2007, because he was getting
married on Saturday September 29, 2007. (A-433). Specifically, he stopped going
to work on September 26, 2007. (A-335). Santarlas was not aware that the final
merger agreement was not produced until after he had left Ropes & Gray in
connection with his wedding. (A-335). On September 28, 2007, Santarlas noticed
a tremendous amount of missed calls on the pre-paid phone from Goldfarb. (A-
244). The 3Com acquisition was announced on September 28, 2007 at 1:26 p.m.,
GMT. (A-245). Approximately two weeks after the announcement, Goldfarb
gave Santarlas an envelope containing $25,000.00 in cash. (A-246). Santarlas

then destroyed the pre-paid phone at the request of Goldfarb. (A-247).

B.    AXCAN

In November of 2007, Santarlas overheard colleagues at Ropes and Gray discussing being staffed on a new deal where a private equity client of Ropes and Gray wanted to purchase Axcan. (A-257). The information was overheard in the lunch room in the office. (A-343). Thereafter, Santarlas and Cutillo told Goldfarb about overheard Axcan information, and Goldfarb furnished Santarlas and Cutillo with two new pre-paid phones. (A-258). The information was provided to Goldfarb in a bar located in midtown Manhattan. (A-345). Cutillo and Santarlas advised Goldfarb that it was the hope that the deal would be finished before Thanksgiving. (A-345). Santarlas then accessed documents on the Ropes and Gray computer regarding Axcan twice on October 25, November 8 and November 17. (A-258). The Axcan acquisition was publically announced on November 29, 2007. (A-258). Santarlas and Cutillo then went to Goldfarb's apartment and each received $7,500.00. (A-259). Goldfarb advised Cutillo and Santarlas that he had received the same amount of money and once again instructed Santarlas and Cutillo to destroy their pre-paid phones. (A-259). Goldfarb also advised Santarlas and Cutillo that the "trader" had received a new job at a bigger firm, as a result of the 3Com and Axcan trades. (A-260).

-16-

C.    <u>CLEAR CHANNEL</u>

While employed at Ropes & Gray, Santarlas performed due diligence and patent work for a company called Clear Channel Communications.  (A-299). Santarlas performed work on Clear Channel in November of 2006. (A–300).  In March of 2008, Cutillo approached Santarlas and advised him that he saw a closing room near his office that related to Clear Channel.  (A-301).  On March 24, 2008, Santarlas accessed a document relating to Clear Channel on Ropes & Gray's computer system.  (A-302).  Cutillo and Santarlas thereafter contacted Goldfarb and advised him that "we had seen a Clear Channel closing room and that we noticed a lot of people were staffed on the Clear Channel matter and working - - there was a lot of people working on the deal."  (A-302).  Thereafter, Cutillo and Santarlas met with Goldfarb and were advised that the deal had not closed and that the "trader" had lost a lot of money.  (A-304).

In May of 2008, Cutillo advised Santarlas that a closing room had once again been set up near his office for Clear Channel.  (A-306).  Cutillo further stated that he had advised Goldfarb of the closing room.  (A-306).  Santarlas testified that he never advised Goldfarb of anything involving Clear Channel after March of 2008.  Thereafter, Goldfarb met with Santarlas and Cutillo and advised them that the "trader" made the money back that he had lost earlier in the year.

-17-

(A-306).

Special Agent Matthew Thoresen:

Special Agent Thoresen ("Thoresen") has been a special agent with the FBI for approximately two years (A-423). At the time of his testimony, Thoresen was assigned to the securities fraud squad, which primarily investigates insider trading. (A-423). Thoresen was not involved in the investigation of the Appellant prior to his arrest. (A-423). Through the use of a Bloomberg system, Thoresen created charts in connection with 3Com and Axcan. (A-426). For 3Com, the charts recorded closing prices for the time period of August 1, 2007 through September 28, 2007. (A-426). With respect to Axcan, the charts refered to closing prices between October 1, 2007 and November 29, 2007. (A-426). In connection with his investigation, Thoresen reviewed the trading records of the Appellant, Emanuel Goffer, Michael Kimelman and Craig Drimal for the periods of August and September of 2007. (A-432). The statements reviewed by Thoresen show the settlement date for each transaction. (A-439). Thoresen testified that a settlement date is the date that the money for the trade or transaction actually exchanges hands. (A-439). Further, he testified that a trade or transaction is actually effected three days prior to the settlement date. (A-439).

A.    3COM

-18-

The 3Com chart, created by Thoresen, showed a substantial increase in 3Com stock value between September 27, 2007 and September 28, 2007, namely: a gain from $3.50 to $4.94.  (A-430).  Thoresen testified that the increase resulted from a public announcement that took place on September 28, 2007, wherein it became public knowledge that a private equity firm was to acquire 3Com.  (A-430).

The Appellant purchased 75,000 shares of 3Com on August 7, 2007 with settlement date of August 10, 2007.  (A-441).  These trades were made from the Appellant's account with Schottenfeld, where he was employed.  (A-965). $264,750.00 was debited from the Appellant's account to complete the 3Com trade.  (A-441).  At the end of the day on September 27, 2007, the Appellant held 260,000 shares of 3Com.  (A-444, 445).  At the end of the day on September 28, 2007, the Appellant had zero shares of 3Com.  (A-445).  The Appellant's gross profit was $378,608.00, which reflects the total cost spent versus the money that he received for selling the stock over the period of August 2007 to September 18, 2007.  (A-445).  Thoresen was not aware if the Schottenfeld account was a proprietary account or the Appellant's personal account.  (A-537).

Emanuel Goffer traded 3Com through an account with Spectrum Trading Group.  (A-451).  Thoresen calculated gross profits from  3Com trades from

August and September of 2007 to be in the amount of $716,742.00. (A-454).

Said gross profit amount did not include the commissions that were paid in

connection with the sale of the securities. (A-454). On August 6, 2007, Emanuel

Goffer did not hold any shares of 3Com. (A-454). On September 27, 2007,

Emanuel Goffer's position in 3Com was that of approximately 510,000 shares. At

the end of the day on September 28, 2007, Emanuel Goffer's position in 3Com

was zero shares. (A-455).

Thoresen calculated Craig Drimal's gross profits from 3Com to be in the

amount of $4,535,000.00. (A-1204). On August 7, 2007, Drimal purchased

525,000 shares with a settlement date of August 10, 2007. (A-461). Drimal also

purchased 30,000 shares of 3Com with a settlement date of September 20, 2007

(1210) and a final purchase of 100,000 shares with a settlement date of September

26, 2007. (A-461). Drimal's 3Com trade was effected on September 21, 2007,

giving him a total position of 3,261,386 shares. (A-463). At the end of the day on

September 28, 2007, Drimal did not own any shares of 3Com. (A-466).

Michael Kimelman traded 3Com in a personal retail account with Options

Express as well as an account with Lighthouse. (A-449). With respect to the

Options Express account, Kimelman received a gross profit of $16,687.00. (A-

456). Thoresen calculated the Lighthouse account to have a gross profit fo

$243,716.00. (A-457). On September 27, 2007, the Lighthouse account held 193,298 shares of 3Com. (A-457). At the end of the day on September 28, 2007, Kimelman held zero shares in the account. (A-457).

### B.    AXCAN

Thoresen testified that on November 29, 2007, it was publically announced that Axcan was being acquired. (A-462, 463). The closing price of Axcan on this date was $18.20. (A-463). After the public announcement, at the end of the day on November 29, 2007 the stock closed at $22.70. (A-463). At the end of the day prior to the announcement of the Axcan acquisition, Drimal's account held 565,523 shares of Axcan. (A-466). Drimal had purchased 20,000 shares of Axcan with a trade date of November 20, 2007 and 159,006 shares with a trade date of November 26, 2007. (A-468). At the end of the day on November 29, 2007, Drimal held no shares of Axcan. (1216). As a result of trading Axcan during the period set forth above, Drimal made a profit of $1,984,867.00 (A-467).

Thoresen also reviewed the accounts of David Plate, an indicted co-conspirator that cooperated with the government, and his sister Jodi Plate. (A-470). At the end of the day on November 28, 2007, before the announcement, Jodi Plate held 4,700 shares of Axcan in her account. (A-471). At the end of the day on November 29, 2007, the account held zero shares. (A-471). Mr. Plate's

Schottenfeld account received a profit of $227,900.00 from the Axcan trades.  (A-472).

Thoresen did not recall seeing Axcan stock being traded by the Appellant. (A-538).

C.    CLEAR CHANNEL

The economic interest in Clear Channel was purchased through options. (A-516).  In reference to the Clear Channel purchase, the options were known as "the May 30s." (A-516).  The May 30s refer to an option to purchase Clear Channel stock at a price of $30.00 with an option that would have to be exercised by the third Saturday or Friday of May, given the year. (A-516).  The $30.00 option is known as a "strike price." (A-515).  This practice is utilized when an investor believes that the value of a stock is going to rise. (A-516).  If the value of the stock rises above $30.00, the investor with exercise his option to purchase the stock at the strike price. (A-516).

On May 9, 2008, Emanuel Goffer purchased 200 of the May 30 call options at a price of 96 cents. (A-517).  The options were sold on May 12, 2008 at a price of $3.80. (A-518).  The options were sold before the public announcement was issued. (A-512).

On May 9, 2008, the Appellant purchased 2,700 Clear Channel options at a

strike price of $27.50. (A-519). The purchase price of the option was

approximately $2.70. (A-519). Additionally, there was a second purchase of

1,025 call options at a strike price of $27.50. (A-519). The purchase price of the

option was $3.05. (A-519). These trades were made while Zvi Goffer was

employed by the Galleon Group. (A-519). The options were sold on May 12,

2008 for $5.90. (A-522). The options were sold before the public announcement

was issued. (A-512). As a result of these transactions, the Galleon Group account

received a profit of $1,002,323.00. (A-522). Thoresen was not aware of whether

the Galleon Group account was a proprietary account or the Appellant's personal

account. (A-537).

<u>Charge Conference and Charge</u>

On May 31, 2011, the district court held a charge conference. (A-688). The

critical issue was whether the defendants traded on material, non-public

information. As a result of this issue, counsel for the parties and the government

submitted a joint proposed charge to the court, which contained significantly

different definitions of material, nonpublic information.

Ultimately, over the objections of defendants counsel, the court instructed

the jury that:

. . . the confirmation by an insider of unconfirmed facts or rumors,

even if reported in a newspaper, may itself be inside information.  A
tip from a corporate insider that is more reliable and specific than
public rumor is non-public information despite the existence of such
rumors in the media or investment community.  Whether or not the
confirmation of a rumor by an insider qualifies as material non-public
information is an issue for you to decide. . . Within the particular
context of the purchase and sale of securities, material information is
information that a reasonable investor would have considered
significant in deciding whether to buy or sell.  Put another way, there
must be a substantial likelihood that the fact would have been viewed
by the reasonable investor as having significantly altered the total mix
of information then available.

(A-802).

## Verdict and Sentencing:

On June 2, 2011, at the conclusion of counsels summations, the district
court completed its charge to the Jury.  On June 13, 2011, at 10:20 a.m. the Jury
sent out a note stating "We have reached a verdict, unanimous on all 14 counts."
(A-872).  The note was signed by the Jury foreperson at 10:15 a.m.  (A-872).  The
Appellant was found guilty on each of the Fourteen Counts.

At sentencing, under the Guidelines, as this matter was an insider trading
offense (U.S.S.G. § 2B1.4), the district court calculated a base level offense of
eight.  (A-976).  After a dispute regarding the profit and/or foreseeable profit, the
district court adopted the submission from the government that profits from the

-24-

Ropes & Gray attorneys totaled $10,022,931.00[3] (3Com, Axcan and Clear Channel). The government did not seek forfeiture for any trades in connection with Hilton and Kronos securities, those being outside of the information provided by the Ropes & Gray attorneys and stated that "We do not have evidence for Mr. Goffer." (A-977). The district court then determined that there was a 20 level enhancement pursuant to § 2B1.1(b)(1)(K). (A-981). There was also a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), because the Appellant was the alleged organizer or leader of the criminal activity. (A-981). In total, the court calculated an offense level of 32. (A-981). The Appellant was sentenced to a term of incarceration of "10 years - - five years on Counts One and Two as the maximum sentence, and 10 years on each of the remaining counts, Counts Three through Fourteen. All sentences shall run concurrently. . . I will impose a forfeiture order of $10,022,931." (A-1016). On the government's motion, the district court dismissed the open counts of the prior indictment. (A-1022).

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Appellant is entitled to a new trial for several reasons. The district court gave the jury a flawed definition of what constitutes "material" information.

---

[3]This amount is no attributable to the Appellant individually.

The term is critical in this case as the information allegedly transmitted lacked pricing information, the names for the private equity firms and the dates of the acquisitions. Additionally, the defense offered evidence of a detailed report in the Wall Street Journal regarding the 3Com acquisition. Therefore, the information was transmitted by the Ropes & Gray attorneys to Goldfarb was already known to the public.

The district court also violated the Appellant's constitutional right to go to trial by counting the exercise of such a right against the defendant as a "negative" factor sufficient by itself to disqualify him/her from an acceptance of responsibility credit. The court also erred at sentencing in finding that the defendant was the leader/organizer of the conspiracy and by sentencing the Appellant to a term of imprisonment that was disproportionate to defendants who have been found guilty of similar conduct. Finally, the district court erred by entering an order of forfeiture

## ARGUMENT

I.   APPELLANT IS ENTITLED TO A NEW TRIAL BECAUSE
     THE DISTRICT COURT GAVE THE JURY AN
     ERRONEOUS DEFINITION OF MATERIAL, NONPUBLIC
     INFORMATION.

On May 31, 2011, the district court held a Charge Conference. (A-688). At

-26-

the conference the court stated the following:

> What I propose to do just go through the charge page by page and if people have proposed changes to what I've circulated then let me know. I've already seen what you have proposed before trial. So to the extent you proposed something different and that I've rejected it, I think your objection is preserved. But if there is something that is clearly in error or that needs a further hearing, then let me know. All right? So what I would typically do is just ask you who has got something next.

(A-688). In the joint request to charge, dated April 28, 2011, the defense

requested that the court charge the following with respect to the definition of

Material, Nonpublic Information:

> The government must also prove beyond a reasonable doubt that the nonpublic information allegedly possessed by the defendants was material. Within the particular context of the purchase and sale of stocks, information is "material" if there is substantial likelihood that a reasonable investor would consider the information significant in deciding whether to buy, sell, or hold securities, and what price to buy or sell.

> Put another way, there must be substantial likelihood that the facts would have been viewed by the reasonable investor as having significantly altered the total mix of information then available. In considering whether information about a particular event was material, you may consider how probable it was that the event would occur at the time the information was disclosed, as well as the importance of the event to the company in question. That is to say, when an event is contingent and uncertain, determining the materiality of information regarding that event requires you to balance the probability that the event will occur and the anticipated magnitude of the event.

A generalized confirmation of an event that is fairly obvious to investors knowledgeable about the company or the particular security at issue is not material information. In order to be nonpublic and material, information must be different from general discussions in the marketplace at the time. Even if an event, like a corporate merger, may be important, information about that even is not material unless it contains something beyond what already was known to the public from news articles, analyst reports, or otherwise, and additional information likely would have been significant to a reasonable investor. A generalized confirmation of an event that is fairly obvious to market participants who are knowledgeable about a company is not material information. Likewise, speculative information is not material. The mere fact that some discussion has taken place on matters that may or may not occur is not material unless it goes beyond speculation and relates to existing facts.

(A-94, 95). Ultimately, the court instructed the jury that:

. . . the confirmation by an insider of unconfirmed facts or rumors, even if reported in a newspaper, may itself be inside information. A tip from a corporate insider that is more reliable and specific than public rumor is non-public information despite the existence of such rumors in the media or investment community. Whether or not the confirmation of a rumor by an insider qualifies as material non-public information is an issue for you to decide. . . Within the particular context of the purchase and sale of securities, material information is information that a reasonable investor would have considered significant in deciding whether to buy or sell. Put another way, there must be a substantial likelihood that the fact would have been viewed by the reasonable investor as having significantly altered the total mix of information then available.

(A-802).

A.   The Court's Definition of Material, Non-public Information was Erroneous.

-28-

"For the purposes of securities laws, information is deemed 'material' if there is a 'substantial likelihood' that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of available information." SEC. v. Rorech, 720 F.Supp.2d 367, 410 (S.D.N.Y.) *citing* Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.E.2d 194 (1988). "This inquiry is guided both by the probability that an event will occur and the anticipated magnitude of the event relative to the totality of the company's activity." United States v. Cusimano, 123 F.3d 83, 88 (2d Cir. 1997). "A generalized confirmation of an event that is 'fairly obvious' to every market participant who was knowledgeable about the company of the particular instrument at issue is not material information." Rorech, supra *citing* SEC v. Monarch Fund, 608 F.2d 938, 942 (2d Cir. 1979) (generalized tips that do not divulge the specific terms of an impending but not yet publically announced securities offering, where no specific terms or dates or names of participants was divulged, "lack[ ] the basic elements of specificity" to be considered material for the purposes of insider trading laws); see also SEC v. Anton, No. 06-2274, 2009 WL 1109324 *8 (E.D.Pa April 23, 2009)(holding that information from an insider was not material "in the context of the information publicly available" because the information provided was "simply confirmation of fact fairly obvious to all who

followed the stock"). (Emphasis supplied). Indeed, this Court in <u>Elkind v. Liggett</u>

<u>& Meyers, Inc.</u>, 635 F.2d 156 (2d Cir.1980) recognized the U.S. Supreme Court's

definition of materiality from <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S.

438, 449, 96 S.Ct. 2126, 2132, 48 L.E.2d 757 (1976):

> What the standard of (materiality) does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stakeholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

> B.     <u>The Record Shows that the 3Com Trades Were Clearly Based on Information that was Available to the Public.</u>

Counts Three through Twelve of the superceding indictment allege that the

Appellant made purchases of 3Com stock based on material, non-public

information. The Appellant tendered a Wall Street Journal article into evidence,

which stated that:

> The consolidation wave that is sweeping the telecom equipment sector may wash over 3Com. The Deal Journal has learned that the company has in the past couple of months been approached by possible buyers, including private equity firms like Silver Lake Partners and Bain Capital. 3Com and its bankers at Goldman Sachs Group don't appear to be rushing to do a deal and it is unclear what price the buyout group was willing to offer. Another company that may be interested in 3Com is Nortel Networks, people familiar with the matter said.

-30-

*　*　*

Whether or not a buyout of 3com is on the horizon, the Marlborough, Massachusetts company is definitely in deal-making mode.

*　*　*

A buyout of 3Com at the right price would likely be music to the ears of investors including Citadel Investment Group, which has taken a stake in nearly 10 percent in 3Com and has agitated for change.

(A-166, 167).  The subject Wall Street Journal article was printed on July 17, 2007. (A-187).  The Appellant's first purchase of 3Com was on August 7, 2007, twenty-one days after the article was published to the public.  Citadel Investment Group, which is referenced in the article, is a group with a known reputation for seeking to aggressively maximize shareholder value.  (A-186).  According to the article, Citadel Investment Group owned approximately ten percent of 3Com.  All aspects of the article were factually correct.  (A-187).  The Wall Street Journal has a reputation for reporting correct facts.  (A-188).  Additionally, on September 15, 2007, a definitive offer was made to purchase 3Com at a price of $5.10 per share. (A-208).  The offer was made by the filing of a SEC 14A Form, which is public SEC filing.  (A-208).

Santarlas testified that in September of 2007, he advised Goldfarb that he was seeing a lot more activity in the 3Com takeover.  (A-243).  At that juncture,

-31-

the Appellant had already purchased 75,000 shares of 3Com in his account with Schottenfeld. After September 15, 2007, the day of the public SEC 14A filing, 278,900 shares were purchased. (A-208). The Appellant's trades were made based on the definitive reports in the Wall Street Journal, and if Santarlas and Cutillo had provided information to Goldfarb prior to the Appellant's purchases of the charged trades, that information was at most, a "generalized confirmation of an event that was 'fairly obvious' to every market participant who was knowledgeable about the company," and therefore was not material, nonpublic information. Rorech, supra at 410. The Jury, which was not properly instructed on this point of law, could not have accurately weighed the evidence in this regard. Given that the definition of material, nonpublic information was central to the case, there is no question that the district court's erroneous instruction influenced the Jury's verdict. According to the government's calculation, the conspirators gain from the 3Com trades were in the approximate amount of $5,887,107.00[4]. Thus, even if the profits from the conspiracy had added up to

---

[4]Said amount does not include the Michael Cardillo trades as the $731,505.00 set forth in the government's sentencing memorandum is a mix of profits from 3Com and Axcan.

$12,448,005.00[5], which the sentencing court expressed doubts regarding, under a Guideline analysis the Appellant should have received an increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) rather than U.S.S.G. § 2B1.1(b)(1)(K).

In the matter at bar, the district court instructed the Jury that "[t]he confirmation by an insider of unconfirmed facts or rumors - even if reported in a newspaper - may be itself inside information."  The charge did not include the more basic and essential concept that the confirmation of information that is already public is not in and of itself non-public information.  As such, the court's instruction impermissibly permitted the Jury to convict the Appellant if they believed that the Ropes & Gray attorneys (Santarlas and Cutillo) confirmed information that was "fairly obvious" to investors.

II.    THE DISTRICT COURT VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHT BY PUNISHING THE DEFENDANT FOR EXERCISING HIS RIGHT TO GO TO TRIAL RATHER THAN ENTERING A PLEA OF GUILTY.

It is clearly unconstitutional for a trial judge to increase the sentence of a defendant because he chose to go to trial rather than plead guilty.  The Supreme Court has stated, "To punish a person because he has done what the law plainly

---

[5]This was the calculation of the Department of Probation in paragraph 40 of the report.  The report has been filed under seal.  The government determined the amount to be $10,022,931.00

-33-

allows him to do is a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.E.2d 604 (1978). The circuits have addressed this issue and agree that it is improper for a trial judge, on his own initiative to impose a harsher sentence on a defendant who chooses to exercise his/her constitutional right to trial rather than plead guilty. See United States v. Crocker, 788 F.2d 802, 809 (1st Cir. 1986) ("The judge's remarks on how the presentation of a frivolous case and the ensuing waste of judicial resources could be factors in determining the sentence to be imposed are sufficient to establish that there was a reasonable likelihood of vindictiveness."); United States v. Hutchings, 757 F.2d 11, 14 (2d Cir. 1985), cert. denied 472 U.S. 1031, 105 S.Ct. 3511, 87 L.E.2d 640 (1985) ("The '[a]ugmentation of sentence' based on a defendant's decision to 'stand on [his] right to put the Government to its proof rather than plead guilty' is clearly improper."); United States v. Wright, 533 F.2d 214, 216 (5th Cir. 1976) ("a trial court may not pressure defendants, who have been found guilty following a trial by jury, to confess their guilt prior to the imposition of sentence."); United States v. Frost, 914 F.2d 756, 774 (6th Cir. 1990) ("[I]t is improper for a district judge to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt."); Hess v. United States, 496 F.2d 936,

-34-

938 (8th Cir. 1974) ("This circuit has joined a host of other courts in recognizing that whether a defendant exercised his right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed."); United States v. Monroe, 943 F.2d 1007, 1018 (9th Cir. 1991), *cert. denied* 503 U.S. 971, 112 S.Ct 1585, 118 L.E.ed 304 (1992) ("[W]here a disparity in sentences suggests that a defendant who pleaded not guilty was being penalized for exercising his constitutional right to a trial, the reasons for the disparity must appear in the record."); United States v. Roe, 670 F.2d 956, 973 (11th Cir. 1982) *cert. denied* 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982) ("[T]he sentencing court may not present the defendant with a choice between admitting his guilt and enduring a harsher sentence for failing to do so.").  The Sentencing Guidelines direct the sentencing judge to reduce the offense by a level of two "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  Although the commentary, in providing a nonexhaustive list of factors for the sentencing judge to consider in deciding whether the acceptance of responsibility discount is warranted, does state that ordinarily the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," it also makes clear that going to trial does not disqualify a

defendant from the reduction where, for instance, his/her pretrial conduct clearly

evinces acceptance of responsibility.  U.S.S.G. § 3E1.1 (Application Note 2).

Finally, the commentary notes that a defendant who pleads guilty may be denied

the credit where other "conduct of the defendant. . . is inconsistent with . . .

acceptance of responsibility."  Id. (Application Note 3).  Therefore, 3E1.1 treats a

plea of guilty as a positive factor that may help to qualify a defendant for atwo-

level reduction.  However, the Guidelines do not treat a defendant's exercise of his

constitutional right to go to  trial as a "negative" factor sufficient by itself to

disqualify him/her from an acceptance of responsibility credit.  Exercise of a

constitutional right was meant to be a neutral factor in the analysis.

> The district court may not deny the reduction because of a lack of
> contrition despite the increased costs imposed upon the defendant's
> choice to remain silent or to proceed to trial, but may not deny the
> reduction because of that choice in spite of other manifestations of
> sincere contrition.

United States v. Sitton, 968 F.2d 947, 962 (9th Cir. 1992) cert. denied 506 U.S 979,

113 S.Ct. 478, 121 L.Ed.2d 384 (1993).  Similarly, the Eleventh Circuit in United

States v. Rodriguez, 959 F.2d 193, 197 (11 Cir. 1992) found:

> [I]f a defendant has shown some sign of remorse but has also
> exercised constitutional or statutory rights, the sentencing judge may
> not balance the exercise of the those rights against the defendant's
> expression of remorse to determine whether the "acceptance" is
> adequate.

-36-

This is also demonstrated in the commentary to U.S.S.G. § 3C1.1 (Application Note 2), which provides for a two-level enhancement where a defendant obstructs or impedes the investigation or prosecution of his/her case:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision.

Thus, the structure and policy of the Guidelines allow the fact of a guilty plea to count as nonconclusive evidence of acceptance of responsibility, but do not permit the mere exercise of a constitutional right to be counted against the defendant in awarding the acceptance credit or in other aspects of sentencing.

In the matter at bar, the sentencing judge begrudged the Appellant for exercising his constitutional right to go trial:

> So there is a gambler mentality that you seem to have then and after then. You got arrested and then again it seems to me that you decided to double down and gamble on a trial. Look, you have a right to go to trial. That is not the point. The point is by accepting responsibility, as you appear to do now postconviction in your letter to the Court in which you acknowledge that you traded on inside information that "I received from Jason Goldfarb and others and passed that information on to my friends and colleagues." The trial demonstrated that clearly but you now have acknowledged that; but had you made that acknowledgment before trial, you might have shaved almost three years off your guidelines sentence. The guidelines would have been much lower had you made that decision then opposed to now. Now,

-37-

you chose to go to trial and again that is your right but you don't get
acceptance of responsibility as a result of that.

(Emphasis supplied). It is clear that the district court was not withholding a

reward it would have given to a guilty pleader, but was rather extending

punishment to one who pleaded not guilty. Had the defendant received the benefit

of a two-level reduction for his acceptance of responsibility, approximately two

years would have been shaved off of his sentence. The Appellant never testified

on his own behalf nor is there any allegation that he obstructed justice or

committed perjury. The Appellant merely exercised his constitutional right, which

cannot be counted against him in awarding the acceptance credit. For such

reasons, the sentence of 120 months of imprisonment should be vacated. At the

very least, the Appellant's sentence should be vacated and remanded for

clarification.

III.    APPELLANT'S COUNSEL WAS INEFFECTIVE IN
        FAILING TO OBJECT TO THE GOVERNMENT'S
        CONTENTION THAT APPELLANT SHOULD RECEIVE A
        FOUR POINT INCREASE UNDER U.S.S.G. § 3B1.1.

Sentencing Guideline § 3B1.1(a) states:

Based upon the defendant's role in the offense, increase the offense
level as follows: (a) If the defendant was an organizer or leader of a
criminal activity that involved five or more participants or was
otherwise extensive, increase by 4 levels.

As this Court is aware, "[u]nder the advisory guidelines regime, the District Court can use the preponderance of the evidence standard to determine whether an enhancement applies." United States v. Holliday, 457 F.3d 121, 130 (1st Cir. 2006). To properly apply U.S.S.G. § 3B1.1, "a district court must make both a status determination – a finding that the defendant acted as a leader or organizer of the criminal activity – and a scope determination – a finding that the criminal activity met either the numerosity of the extensiveness benchmarks established by the guidelines." United States v. Tejada-Bletran, 50 F.3d 105, 110 (1st Cir. 1995). A role adjustment pursuant to § 3B1.1 is assessed based on "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991). In United States v. Thiongo, 344 F.3d 55 (1st Cir. 2003), in upholding a district court's rejection of a § 3B1.1 aggravated role enhancement, the court noted that the defendant employed alleged "participants" only to a "limited extent" and would have committed the same crimes in essentially the same way absent the assistance of these individuals. "But to be found 'responsible for organizing others," and thereby subject to a § 3B1.1 enhancement, a defendant must have at least played a significant role in the

-39-

decision to recruit or to supervise lower-level participants." United States v. Greenfield, 44 F.3d 1141, 1147 (2d Cir. 1995).

Courts typically look at factors such as specific recruitment of accomplices, exercise of control over others, and use of decision-making authority. See e.g. United States v. Leonard, 37 F.3d 32 (2d Cir. 1994). This Circuit has determined that control over others is absolutely necessary to support an enhancement under § 3B1.1. United States v. Greer, 223 F.3d 41 (2d Cir. 2000); United States v. Cambrelen, 2001 WL 219285 (2d Cir. NY)); see also United States v. Lozano-Hernandez, 89 F.3d 785, 790 (11th Cir. 1996) (holding that the district court erred in enhancing the defendant's sentence two levels for his role in the offense where no evidence showed that Defendant supervised or controlled anybody). Active participation in the day to day activities of another may suggest requisite control. See United States v. Brinkworth, 68 F.3d 633 (2d Cir. 1995).

The Second Circuit has also stressed the importance of making individualized findings of fact to support an increase in the base offense level for a defendant's role in the offense. In enhancing a defendant's sentence based on his role in the offense, the district court must make specific factual findings as to that role. United States v. Stevens, 985 F.2d 1175 (2d Cir. 1993). This Court in Stevens stated that "[t]hough requiring a district judge to make specific factual

-40-

findings in determining the applicable sentencing guidelines may interfere with the smooth operation of the sentencing hearing, specific findings are needed to permit appellate review of the sentence imposed." Id at 1189.  In Stevens, this Court determined that the district court erred in failing to make factual findings in support of a four-level enhancement for his specific role in the offense.  The appellate court made this determination despite the fact that the district court stated that a large number of persons were involved in the transaction, the sales of large quantities of narcotics are rarely made without a supporting organization, and that the defendant was a middleman.  The Second Circuit remanded to the district court to make appropriate findings.

Whether a defendant is considered a leader depends on the degrees of discretion exercised by him, the nature and degree of his participation in the planning and organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy.  United States v. Beaulieu, 959 F.2d 375 (2d Cir. 1992). In United States v. Melendez, 41 F.3d 797 (2d Cir. 1994), this Court vacated the leadership enhancement where the district court failed to make specific findings, including the requirement that there be five or more participants involved in the offense. Id at 799-800. This Court noted that the district court could not count as "participants" other individuals who were not

involved in the defendant's offense of conviction. In the absence of evidence that the other individuals were implicated in the crime, "had advance knowledge of the [crime], much less participated in its planning or execution," the court ruled that the district court erroneously relied upon them for calculating the number of persons in the offense. Id at 800.  Other circuits have also recognized the requirement that the court make specific findings as to the Appellant's actions before imposing a §3B1.1 enhancement.  The Ninth Circuit has noted that in order to factually support a finding under § 3B1.1(a), "there must be evidence that the defendant exercised some control over others involved in the commission of the offense or was responsible for organizing others for the purpose of carrying out the crime."  United States v. Avila, 95 F.3d 887, 892 (9th Cir. 1996).  (citation omitted).  The court vacated the four-level increase, finding that "in the absence of any evidence that [the defendant] exercised control or authority" over other participants, the enhancement would be an improper application of the guidelines. Id.

A.    At sentencing Appellant's counsel simply conceded that the Appellant was the Leader/Organizer of the conspiracy.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate "(1) counsel's performance was unreasonably deficient under

-42-

prevailing professional standards, and (2) but for counsel's unprofessional errors, there exists a reasonable probability that the result would have been different." United States v. Torres, 129 F.3d 710, 716 (2d Cir. 1997) *citing* Strickland v. Washington, 466 U.S.668, 687 (1984). A "reasonable probability" is one "sufficient to determine confidence in the outcome." Flores v. Demskie, 215 F.3d 293, 304 (2d Cir. 2000). The right to effective assistance of counsel, however, may be violated by "even an isolated error of counsel if that error is sufficiently egregious and prejudicial." Murray v. Carrier, 477 U.S. 478 (1986); Kimmelman v. Morrison, 477 U.S. 365, 383 (1986) ("[A] single, serious error may support a claim of ineffective assistance of counsel.").

The Appellant was sentenced on September 21, 2011. This district court began with a calculation of the guidelines pursuant to the probation report and the disputes between the parties. The court found that there was a base offense level of eight because this matter is an insider trading case. (6). After argument, the court found a 20 level enhancement under U.S.S.G. § 2B1.1(b)(1)(K), because the conspiracy involved more than $7,000,000.00. (11). The following discussion then ensued:

> THE COURT: There is a four-level enhancement because Mr. Goffer was an organizer or leader of the criminal activity involving five or more persons. That is an enhancement pursuant to 3B1.1(a).

-43-

You are not disputing that, Mr. Barzee?

MR. BARZEE: We are not.

(11).  During the sentencing argument, Appellant's counsel stated the following:

Mr. Cutillo is the one who stole the information, the inside information, from the law firm to pass it along to Mr. Goffer through Jason Goldfarb.  Mr. Cutillo was sentenced to 30 months. All of the Ropes & Gray trades all flow from Mr. Cutillo.  All of Mr. Drimal's, all of my (sic) Michael Kimelman's, Zvi Goffer's, his brother's, they flow from the same person and that person received 30 months.

So Zvi Goffer is more responsible than Arthur Cutillo.  Why? Well, because he is the one who went out an (sic) bought the cell phones, because he is the one who paid cash to people, because he is the one that was much, much more responsible.  No question.  How much more responsible was Zvi Goffer than Arthur Cutillo?  Were his actions twice as bad as Arthur Cutillo's?  Were they really twice as bad? 100 percent plus another plus another hundred?  If so a fair sentence for Zvi Goffer would be something around 60 months.  Were they three times as bad as Arthur Cutillo?  If so, maybe an appropriate sentence would be 90 months.  I don't know if they were. I am pointing these out to the Court.

In the matter at bar, counsel's performance was unreasonably deficient under prevailing professional standards - trial counsel waived any argument that his client did fall within the parameters of a U.S.S.G. § 3B1.1(a) enhancement. There can be no reasonable explanation, such as sentencing strategy, for not allowing the district court to exercise its discretion making authority in determining that Appellant's participation in the commission of the offense, the

-44-

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

B.    The Appellant's conduct did not warrant a four-level increase under § 3B1.1.

The Appellant should not have received a four-level enhancement under § 3B1.1(a) for his role in the offense, as the Appellant was not an organizer or leader of a criminal activity that involved five or more participants.

Santarlas, an associate attorney with Ropes & Gray testified that he was advised by his colleague, Cutillo, that he had a good friend that knew a "trader" who would pay money for tips and information related to corporate buyouts or acquisitions. (422). Santarlas never met with this "trader." (422). Thereafter, Santarlas was introduced by Cutillo to Goldfarb, who relayed similar information regarding his "trader" friend. (423). Santarlas and Cutillo then provided Goldfarb with information regarding the 3Com acquisition. (429). As the 3Com deal progressed, the Ropes & Gray attorneys proceeded report back to Goldfarb via pre-paid cellular telephones that were furnished by Goldfarb. (429). Santarlas further testified that Goldfarb stated that he and "trader" also had pre-paid cellular

-45-

telephones that they would communicate on. (430). In September of 2007, Santarlas reported to Goldfarb that there was much more activity on the 3Com matter, namely: that they were seeing a lot more documents regarding the acquisition. (432). On September 28, 2011, Goldfarb contacted Santarlas and advised him that the 3Com deal had been announced and that he was going to meet with the "trader" to receive a payment. (434).

There is no evidence of recruitment of accomplices, exercise of control over others, nor of use of decision-making authority. There is not a scintilla of testimony regarding Appellant approaching Goldfarb and directing him to solicit information from those with non-public and material information. At most, the Appellant was a co-conspirator as a "tippee" recipient of possible non-public information from those who are insiders. SEC v. Ballesteros Franco, 253 F.Supp.2d 720, 726 (S.D.N.Y. 2003).

> An individual is liable as a tippee under Rule 10b-5 if (1) the tipper possessed material nonpublic information regarding a publically traded company; (2) the tipper disclosed this information to the tippee; (3) the tippee traded in securities while in the possession of the information; (4) the tippee knew. . . that the tipper had violated a fiduciary duty by providing the information to the tippee; and (5) the tippee benefitted from the disclosure of the information by the tipper.

U.S. v. Rajaratnam, 2011 WL 3585075 (S.D.N.Y. 2011) *citing* Ballestros Franco, supra. Any information distributed by the Appellant to the other co-conspirators

regarding a potential 3Com or Axcan acquisition in no way lends him to the organizer category.

Although it may be argued counsel's representation was otherwise adequate, the right to effective assistance of counsel may be violated by "even an isolated error if that error is sufficiently egregious and prejudicial." Murray v. Carrier, 477 U.S. 478 (1986). Here, counsel waived any argument that the Appellant was not the leader or organizer of the conspiracy. As set forth above, there was no evidence that the Appellant recruited accomplices, had exercise of control over others, or exercised decision-making authority. A hearing pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979) should have been requested to determine the facts. Thus, the error at issue here was so egregious that standing alone it amounts to ineffective assistance such that the Appellant's constitutional rights were violated.

IV.    THE SENTENCE IMPOSED, WHEN VIEWED IN THE TOTALITY OF THE CIRCUMSTANCES, IS DISPROPORTIONATE TO SIMILARLY SITUATED DEFENDANTS.

The Appellant was sentenced to 120 months imprisonment. Although the courts are incredibly remise to disturb sentences imposed by district courts because of the fact-dependent and unique nature of sentences, the defendant's

sentence should be vacated.  It is also recognized that the success of

proportionality challenges are "exceedingly rare" and that there is no

proportionality guarantee within the Eighth Amendment.  <u>Harmelin v. Michigan</u>,

501 U.S. 957, 963 (1991).  It is also recognized that the Second Circuit has held

that "section 3553(a)(6) requires a district court to consider disparities, but does

not require a district court to consider disparities between co-defendants."  <u>United</u>

<u>States v. Frias</u>, 521 F.3d 229, 236 (2d Cir. 2008) <i>citing</i> <u>United States v. Wills</u>, 476

F.3d 103, 109-11 (2d Cir. 2007).

     As a result of the holding in <u>United States v. Booker</u>, 542 U.S. 220 (2005),

the Court is no longer required to impose a sentence within the range as provided

by the United States Sentencing Guidelines.  While the imposition of a sentence in

accordance with the United States Sentencing Guidelines is not mandatory, the

Guidelines are advisory and the Court is required to consider any applicable

Guideline provisions as well as other factors enumerated in 18 U.S.C. § 3553 to

arrive at the appropriate sentence in this case**.**  <u>See</u> <u>United States v. Crosby</u>, 397

F.3d 103 (2d Cir. 2005).  18 U.S.C. § 3553(a) directs a sentencing court to

consider (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the need for the sentence imposed (A) to

reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the guideline range and sentence; (5) any pertinent policy statement; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct and (7) the need to provide restitution to any victims of the offense. Title 18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary," to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, *inter alia*. The ultimate goal of the sentencing court is to find just punishment by carefully balancing important public policy considerations along with the prophylactic and rehabilitative objectives of 18 U.S.C. § 3553(a).

In United States v. Rajaratnam, 09 CR 1194 (S.D.N.Y.) (RJH), the defendant Raj Rajaratnam was sentenced to 132 months imprisonment. At sentencing, it was determined that Rajaratnam's gains resulting from the offense were greater than $50,000,000.00, thereby increasing his baseline offense of eight under U.S.S.G. § 2B1.4(a) by twenty-four levels pursuant to U.S.S.G. §

-49-

2B1.1(b)(1)(L). Also, there was a four level enhancement for Rajaratnam's leadership role  and a two level enhancement for obstruction of justice.  Under the Guidelines, Rajaratnam was within a sentencing guideline range of 235 to 293 months in prison.  Despite the dollar amount gained through fraud and the defendant having obstructed an SEC investigation, Rajaratnam was sentenced to just one year more than the Appellant.  In United States v. Nacchio, 05-CR-545 (D.Col), the defendant was convicted of 19 Counts of insider trading of Quest stock, a company which he served as Chief Executive Officer.  The defendant was sentenced to six years of imprisonment and was ordered to forfeit $52,000,000.00. In United States v. Contorinis, 09 CR 1083 (S.D.N.Y.) (RJS), the defendant was convicted of one count of conspiracy and seven counts of securities fraud.  In addition to the Order of Forfeiture in the amount of $12,650,000.00, the defendant was sentenced to a term of imprisonment of 72 months. Other than Rajaratnam, the only defendant sentenced to 120 months, or more, was in United States v. Nassem, 07 CR 610 (S.D.N.Y.) (RPP).  In Nassem, the defendant was employed at Credit Suisse and  began to pass inside information about mergers and acquisition deals to his co-conspirator, who traded in the securities of the respective target companies.  Ultimately, the defendants' illicit profits from the charged scheme totaled nearly $8,000,000.00.  In that matter, the defendant abused his position of

-50-

public or private trust and used a special skill to facilitate the offense. Indeed, in his sentencing memorandum, the Appellant provided the district court with fifty examples of insider trading sentences in the state of New York from the year of 2004 to the present. Other than Nassem, none of the sentences have been remotely as harsh as the Appellant's. The defendant argued this issue at sentencing:

> Craig Drimal I think received a sentence of 66 months. . . That being said, any sentence over 66 months that Zvi Goffer were to receive would be one of the most severe sentences ever handed down in one of these cases. The appendix that I filed with the Court, and I know the Court is familiar with all of those cases, evolved over time. If you look at the sentences back in 2004, they were very, very low sentences. I didn't do a chart, but you can see over time that the sentences do get longer and longer. Still sentences between five and ten years are rare. There are some for sure, and I know that Mr. Contorinis went to trial with you Honor recently with the same prosecutor I believe was sentenced somewhere between five and ten years? . . . 72 months. I know Mr. Contorinis took the stand in his own defense. I know that he committed perjury in his trial. The fact of the matter is Zvi Goffer did not take the stand in his own defense, did not commit perjury, did not obstruct justice the way Craig Drimal did.

(21-22).    Clearly, the district court failed to consider such disparities.

Additionally, co-defendant disparity as a basis for sentencing is consistent with the weight of authority. Courts have considered smaller reference groups in considering whether a particular sentence creates or eliminates unwarranted sentencing disparity. See United States v. Cherry, 366 F.Supp.2d 372 (E.D.Va

2005), United States v. Gray, 362 F.Supp.2d 714 (S.D.W.Va. 2005)(non-guideline

sentence based on lower sentence imposed on co-defendant); United States v.

Gordon, 2006 WL 1675921 (S.D.N.Y. 2006)(Sentencing defendant within

advisory guidelines range would create unwarranted sentence disparity with his

co-defendant, who was the leader and organizer under the conspiracy).  As stated

above Craig Drimal, who personally profited $6,286,454.00 (more than half of the

gain from the conspiracy) from the 3Com and Axcan information and obstructed

justice received a sentence of 66 months.  Arthur Cutillo, an attorney, who abused

his position of public or private trust and used a special skill to facilitate the

offense, received 30 months of imprisonment.  For the reasons set forth herein, the

sentence should be vacated and remanded for re-sentencing.

V.    THE DISTRICT COURT ERRED IN ORDERING THE
       APPELLANT TO FORFEIT $10,022,931.00.

As required by Fed.R.Crim.P 32.2, the superceding indictment filed against

the Appellant provided notice of the government's intention to seek forfeiture of a

sum of money.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or

personal, which constitutes or is derived from proceeds traceable to a violation" is

subject to forfeiture.  The purpose of criminal forfeiture is to prevent a defendant

from enjoying the benefits of ill-gotten gains.  See United States v. Venturella, 585

F.3d 1013, 1019 (7th Cir. 2009)("forfeiture seeks to punish a defendant for his ill-gotten gains by transferring those gains. . . to the United States Department of Justice"); United States v. Briing, 557 F.3d 707, 714 (6th Cir. 2009) ('Forfeiture. . . is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity"); United States v. Hoover-Hankerson, 511 F.3d 164, 171 (D.C.Cir 2007) ("Forfeiture is a means of forcing a criminal defendant to disgorge ill-gotten profits"); United States v. Casey, 444 F.3d 1071, 1073-74 (9th Cir. 2006) (holding that it is "clear that Congress intended criminal forfeiture provisions to eliminate the profit for certain criminal activities" and imposing a money judgment equal to the defendant's "ill-gotten gains").

To the extent that the applicable forfeiture statute is not clear on this point, any ambiguity as to the statute's application here should be resolved in the Appellant's favor.  See United States v. Santos, 553 U.S. 507, 514 (2008) (applying the rule of lenity to the interpretation of "proceeds" as used in the federal money laundering statute); United States v. McKeithen, 822 F.2d 310, 315 (2d Cir. 1987) (applying the rule of lenity to the interpretation of the forfeiture provision of the federal "continuing criminal enterprise" statute); United States v. Kalish, 2009 WL 130215 at *8 (S.D.N.Y. 2009)(applying the rule of lenity to the interpretation of "proceeds" as used in the federal forfeiture statute).

-53-

At sentencing, counsel for the Appellant stated that "Craig Drimal who was a co-defendant in the case who I think engaged in the largest financial trades in the case by many, many millions in its own personal accounts - - remember, Zvi Goffer never traded in his own personal case, he traded in the proprietary accounts." (A-21). Co-defendant Craig Drimal was ordered to forfeit $11,000,000.00 at sentencing. Co-defendant Michael Kimelman was ordered to forfeit $289,079.00. Co-defendant Emanuel Goffer was ordered to forfeit $761,623.00. Said amounts represent the personal gain of each of the individual co-defendants, which was "received," "gained," "realized," or "enjoyed" as a result of their illegal activities. In the government's sentencing memorandum, it is conceded that the Appellant's gain was not personal; the trades made were in proprietary accounts with Galleon and Schottenfeld. In fact, the Appellant never traded Axcan stock. While the Appellant may have received a portion of the profits and/or commissions for his work, the total profit imputed to the proprietary accounts have never realized by the Appellant. Appellant could not foresee the equity that was going to be purchased by the tippees. In ordering forfeiture in the amount of $10,022,931.00, the court was not disgorging the offender of amounts personally realized from his activity, but incorrectly added profits that were subject to Orders of Forfeiture against co-defendants. The district court never

inquired into how much of the amount had been "received," "gained," "realized," or "enjoyed" by the Appellant. As such, the district court erred when it ordered the Appellant to forfeit funds based on the total profits attributable to the conspiracy, and not by the Appellant himself.

## CONCLUSION

For the foregoing reasons, the Judgment and the Forfeiture Order should be vacated.

Dated:        Brooklyn, New York
              January 23, 2012

/s/Alexander M. Dudelson, Esq.
ALEXANDER M. DUDELSON, ESQ.
26 Court Street - Suite 2306
Brooklyn, New York 11242
(718) 855-5100
ADESQ@aol.com

*Attorney for Defendant-Appellant*
*Zvi Goffer*

-55-

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Defendant-Appellant Zvi Goffer certifies that this brief complies with the type-volume limitation set forth in Fed.R.App.P. 32(a)(7)(B)(i). This brief contains 12,406 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii). In preparing this certificate, I relied of the word count program in Corel Wordperfect.

This brief complies with the typeface requirements of Fed.R.App.P 32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief has been prepared using Corel Wordperfect in 12 point Court font

Dated: January 23, 2012

/s/Alexander M. Dudelson, Esq.
Alexander M. Dudelson

-56-

SPECIAL APPENDIX

## **Table of Contents**

**Page**

Judgment of the United States District Court,
    Southern District of New York, entered September 22, 2011 ....... SPA1

Notice of Appeal, dated September 30, 2011 ...................................... SPA7

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| Zvi Goffer | ) | Case Number: S1: 10 Cr. 56-01 |
| | ) | USM Number: 62877-054 |
| | ) | William Barzee |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)    One through Fourteen
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 371 | Conspiracy to Commit Securities Fraud | 11/4/2009 | 1-2 |
| 15 USC 78j(b) & 78ff | Securities Fraud | 11/4/2009 | 3-14 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    all open counts    ☐ is    ☑ are    dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/22/2011
Date of Imposition of Judgment

Signature of Judge

Hon. Richard J. Sullivan        U.S.D.J.
Name of Judge                    Title of Judge

9/21/2011
Date

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-22-11

AO 245B   (Rev. 09/08) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___6___

DEFENDANT:  Zvi Goffer
CASE NUMBER:  S1: 10 Cr. 56-01

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

120 months.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court strongly recommends that the defendant be designated to FCI Otisville or another facility as close as possible to the New York City area so that the defendant's family members, particularly his children, may visit him.  The Court also recommends that the defendant be enrolled in the 500-hour Residential Drug Assistance Program.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on __10/21/2011__ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to ___ _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
        Sheet 3 — Supervised Release

DEFENDANT: Zvi Goffer                                    Judgment—Page ___3___ of ___6___
CASE NUMBER:  S1: 10 Cr. 56-01

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

3 years.

        The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

        If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

        The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**SPA4**

AO 245B
(Rev. 09/08) Judgment in a Criminal Case
Sheet 3C — Supervised Release

DEFENDANT:  Zvi Goffer

CASE NUMBER:  S1: 10 Cr. 56-01

Judgment—Page   4   of   6

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer with access to any requested financial information.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

3. The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include testing via breathalyzer at the direction and discretion of the probation officer.

4. The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has a reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in reasonable manner.  Failure to submit to a search may be grounds for revocation.  The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

5. The defendant shall report to the nearest Probation Office within 72 hours of release from custody.

6. The defendant shall be supervised in the district of his residence.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
         Sheet 5 — Criminal Monetary Penalties

DEFENDANT: Zvi Goffer                                    Judgment — Page __5__ of __6__
CASE NUMBER: S1: 10 Cr. 56-01

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 1,400.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0.00 | $ 0.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine   ☐ restitution.

    ☐ the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  Zvi Goffer                                                    Judgment - Page ___6___ of ___6___
CASE NUMBER:  S1: 10 Cr. 56-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___1,400.00___ due immediately, balance due

       ☐  not later than _____ , or
       ☐  in accordance    ☐ C,    ☐ D,    ☐ E, or    ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
       term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:

     See separate forfeiture order.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

9/30/2011

465-4616 17793

CR 10/56 -

**Criminal Notice of Appeal - Form A**

PRO SE OFFICE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3 0 SEP 2011

# NOTICE OF APPEAL

**United States District Court**

**Southern** _____ District of **New York**

Caption:

US _____ v.

Zvi Goffer

Docket No.: 10 cr 56
JUDGE SULLIVAN
(District Court Judge)

Notice is hereby given that Zvi Goffer appeals to the United States Court of
Appeals for the Second Circuit from the judgment [✓], other [ ]
_____ (specify)
entered in this action on 9-22-11
(date)

This appeal concerns: Conviction only [ ]   Sentence only [ ]   Conviction & Sentence [✓]   Other [ ]

Defendant found guilty by plea [ ]   trial [✓]   N/A [ ]

Offense occurred after November 1, 1987?   Yes [✓]   No [ ]   N/A [ ]

Date of sentence: 9-21-11   N/A [ ]

Bail/Jail Disposition: Committed [ ]   Not committed [✓]   N/A [ ]

2011 SEP 30 AM 9:55

Appellant is represented by counsel? Yes [✓] No [ ]   If yes, provide the following information:

Defendant's Counsel: Zvi Goffer

Counsel's Address: 7521 Avenue W
Brooklyn NY 11234

Counsel's Phone: 646-498-3863

Assistant U.S. Attorney: Andrew Fish  Richard Tarlowe

AUSA's Address: _____

AUSA's Phone: _____